Christopher Celentino (SBN 131688)
Yosina M. Lissebeck (SBN 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-0500
Fax: (619) 400-0501
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
**DINSMORE & SHOHL, LLP**
100 West Main Street, Suite 900
Lexington, KY 40507
Tel: (859) 425-1046
Fax: (859) 425-1099
tyler.powell@dinsmore.com

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>Debtor.<br><br>Richard A. Marshack, Trustee of the LPG Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>Oxford Knox, LLC, a Delaware limited liability company; Buffalo 21 Partners, Inc., a Wyoming corporation; Jason Dovalina, individually; Rachel Dovalina, individually; Syed Faisal Gilani aka Sye Gilani, individually; BAE Enterprises, Inc., a Wyoming corporation; Samson Ly, individually; BEW Solar Management, LLC, a California limited liability company; Lexicon Consulting, LLC, a Colorado limited liability company; United Partnerships, LLC, a Florida limited liability company; Ventura Consulting, LLC, a Nevada limited liability company; Matthew Church, individually; Frank Brown, individually; Validation, LLC, a terminated California limited | Chapter 11<br><br>Case No.: 8:23-bk-10571-SC<br>Adv. No: 8:25-ap-01208-SC<br><br>**TRUSTEE'S SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF PREFERENTIAL TRANSFERS MADE TO OR FOR CERTAIN DEFENDANTS MADE WITHIN NINETY DAYS OF THE PETITION DATE;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF POST-PETITION TRANSFERS MADE TO OR FOR THE BENEFIT OF CERTAIN DEFENDANTS;**<br><br>**(3) AVOIDANCE OF DEBTOR'S EXECUTION OF REPAYMENT AGREEMENT WITH DEFENDANT OXFORD KNOX, LLC PURSUANT TO 11 U.S.C. §§ 548(a), 550, AND 551;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§** |

| | | |
|---|---|---|
| 1 | liability company; Spectrum Payment Solutions, LLC, a California limited liability company; Home Energy Solutions, Inc., a California corporation; JNR Services, Inc., a California corporation; C.A.T. Exteriors, Inc., an Arizona corporation; AZLS Enterprises, Inc, a California corporation; and INVESTLINC Wealth Services, Inc., a California corporation. | **548(a)(1), 550, AND 551;** |

liability company; Spectrum Payment Solutions, LLC, a California limited liability company; Home Energy Solutions, Inc., a California corporation; JNR Services, Inc., a California corporation; C.A.T. Exteriors, Inc., an Arizona corporation; AZLS Enterprises, Inc, a California corporation; and INVESTLINC Wealth Services, Inc., a California corporation.

Defendants.

**548(a)(1), 550, AND 551;**

**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(2), 550, AND 551;**

**(6) AVOIDANCE, PRESERVATION, AND RECOVERY OF VOIDABLE TRANSFERS MADE WITH INTENT TO DEFRAUD [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07];**

**(7) AVOIDANCE, PRESERVATION, AND RECOVERY OF VOIDABLE TRANSFERS MADE WITH NO INTENT TO DEFRAUD [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07];**

**(8) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFERS MADE TO OR FOR THE BENEFIT OF DEFENDANTS GILANI AND DOVALINA ARISING FROM USE OF AMERICAN EXPRESS CARD; and**

**(9) OBJECTION TO PROOF OF CLAIM NO. 818 OF OXFORD KNOX, LLC**

Honorable Scott C. Clarkson
Dept. 5C

For his *Second Amended Complaint for: (1) Avoidance, recovery, and preservation of preferential transfers made to or for certain defendants made within ninety days of the petition date; (2) Avoidance, recovery, and preservation of Post-Petition transfers made to or for certain defendants; (3) Avoidance of Debtor's execution of repayment agreement with defendant Oxford Knox, LLC pursuant to 11 U.S.C. §§548(a), 550, and 551; (4) Avoidance, rrecovery, and preservation of fraudulent transfers(s) pursuant to 11 U.S.C. §§548(a)(1), 550, and 551; (5) Avoidance, recovery, and preservation of fraudulent transfer(s) to 11 U.S.C. §§548(a)(2), 550, and 551; (6) Avoidance, preservation, and recovery of voidable transfers made with intent to defraud [11 U.S.C. §§544, 550, 551; Cal. Civ Code §§3439.04(a)(1) and 3439.07;] (7)Avoidance, preservation, and recovery of*

*voidable transfers made with no intent to defraud [11 U.S.C. §§544, 550, 551; Cal. Civ. Code §§3439.04(a)(2), 3439.05, and 3439.07]; (8) Avoidance, recovery, and preservation of fraudulent transfers made to or for the benefit of Defendants Gilani and Dovalina arising from use of American Express Card; and (9) Objection to Proof of Claim No. 818 of Oxford Knox, LLC* (the "Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

**<u>STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE</u>**

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

**<u>THE PARTIES</u>**

5.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

6.      Defendant Oxford Knox, LLC is, and at all material times represented that it was, a Delaware - domestic limited liability company ("Oxford Knox").

#63391135v2

7.      Defendant Oxford Knox may be served by first class mail postage prepaid upon its Partnership Representative: Richard R. Emmett, 251 Little Falls Drive, Wilmington, Delaware 19808.

8.      Defendant Buffalo 21 Partners, Inc. is, and at all material times represented that it was, a Wyoming - domestic corporation, ("Buffalo 21").

9.      Defendant Buffalo 21 may be served by first class mail postage prepaid upon its CEO: Richard R. Emmett, 1309 Coffeen Avenue, Suite 1200, Sheridan, Wyoming 82801.

10.     Defendant Jason Dovalina is, and at all material times represented that he was, an individual residing in the state of California ("Jason Dovalina").

11.     Defendant Jason Dovalina, may be served by first class mail postage prepaid upon himself; 128 W. Santa Fe Avenue, Suite C, Placentia, California 92870-5632.

12.     Defendant Rachel Dovalina is, and at all material times represented that she was, an individual residing in the state of California ("Rachel Dovalina").

13.     Defendant Rachel Dovalina, may be served by first class mail postage prepaid upon herself; 736 Oceanview Drive, Fullerton, California 92832.

14.     Defendant Syed Faisal Gilani aka Sye Gilani is, and at all material times represented that he was, an individual residing in the state of California ("Gilani").

15.     Defendant Gilani may be served by first class mail postage prepaid upon himself: 7651 Greenock Way, Riverside, California 92508.

16.     Defendant Bae Enterprises, Inc. is, and at all material times represented that it was, a Wyoming - domestic corporation ("Bae Enterprises").

17.     Defendant Bae Enterprises may be served by first class mail postage prepaid upon its registered agent: Cloud Peak Law, LLC, 1095 Sugarview Drive, Suite 500, Sheridan, Wyoming 82801.

18.     Defendant Samson Ly is, and at all material times represented that he is a resident of California ("Ly").

19.     Defendant Ly may be served by first class mail postage prepaid upon himself: 208 S. Moore Avenue, Apt. D, Monterey Park, California 91754.

20.     Defendant BEW Solar Management, LLC is, and at all material times represented that

#63391135v2

1    it was, a California – domestic limited liability company ("BEW Solar").

2        21.    Defendant BEW Solar may be served by first class mail postage prepaid upon its

3    manager: Sean M. Stephens, 2560 N. Synergy Avenue, Eagle, Idaho 83616.

4        22.    Defendant Lexicon Consulting, LLC is, and at all material times represented that it

5    was, a Colorado limited liability company ("Lexicon").

6        23.    Defendant Lexicon may be served by first class mail postage prepaid upon its

7    registered agent: Vanghagen Law, PC, 44 Cook Street, Suite 110 Denver CO 80206.

8        24.    Defendant United Partnerships, LLC. is, and all material times represented that it was,

9    a Florida limited liability company ("United Partnerships").

10        25.    Defendant United Partnerships may be served by first class mail postage prepaid upon

11    its registered agent: Frank Brown, 215 New River Drive East 910, Fort Lauderdale, FL 33301.

12        26.    Defendant Ventura Consulting, LLC is, and at all material times represented that it

13    was, a Nevada - domestic limited liability company ("Ventura").

14        27.    Defendant Ventura may be served by first class mail postage prepaid upon its member

15    Matthew Church; 708 Grandview Avenue, Fullerton, California 92832 and/or 10620 Southern

16    Highlands Parkway, Suite 110-18, Las Vegas, Nevada 89141.

17        28.    Defendant Matthew Church is, and at all material times represented that he was an

18    individual residing in the states of California and Nevada ("Church")

19        29.    Defendant Church may be served by first class postage prepaid upon himself; 708

20    Grandview Avenue, Fullerton, California 92832 and 10620 Southern Highlands Parkway, Suite 110-

21    18, Las Vegas, Nevada 89141.

22        30.    Defendant Frank Brown is, and at all material times represented that he was an

23    individual residing in the state of Nevada ("Brown").

24        31.    Defendant Brown may be served first class postage prepaid upon himself: and 10620

25    Southern Highlands Parkway, Suite 110-18, Las Vegas Nevada 89141 and 10881 Pentland Downs

26    Street, Las Vegas, Nevada 89141.

27        32.    Defendant Validation, LLC is currently a terminated California limited liability

28    company that dissolved on September 19, 2022 ("Validation").

#63391135v2

33.   Defendant Validation may be served by first class mail postage prepaid delivered to its last registered agent Matthew Church at either 708 Grandview Avenue, Fullerton, California 92832 and 10620 Southern Highlands Parkway, Suite 110-18, Las Vegas, Nevada 89141.

34.   Defendant Spectrum Payment Solutions, LLC is, and at all material times represented that it was, a California – domestic limited liability company ("Spectrum").

35.   Defendant Spectrum may be served by first class mail postage prepaid upon its agent Samson Ly; 208 S. Moore Avenue, Apt. D, Monterey Park, California 91754.

36.   Defendant Home Energy Solutions, Inc. is, and at all material times represented that it was a California – domestic corporation ("Home Energy").

37.   Defendant Home Energy may be served by first class mail postage prepaid upon its Financial Manager: Rick R. Emmett, 300 S. Harbor Boulevard., Suite 1000, Anaheim, California 92805.

38.   Defendant JNR Services, Inc. is, and at all material times represented that it was a California – domestic corporation ("JNR").

39.   Defendant JNR may be served by first class mail postage prepaid upon its agent Rick R. Emmett; 10 Pointe Drive, Suite 150, Brea, California 92821.

40.   Defendant C.A.T. Exteriors, Inc. is, and at all material times represented that it was an Arizona – domestic corporation ("CAT Exteriors").

41.   Defendant CAT Exteriors may be served by first class mail postage prepaid upon its agent Rick R. Emmett: 10 Pointe Drive, Suite 150, Brea, California 92821.

42.   Defendant AZLS Enterprises Inc. is, and at all material times represented that it was a California – domestic corporation ("AZLS").

43.   Defendant AZLS may be served by first class mail postage prepaid upon its agent: Hee S. Noh, 9 Traditional Place, Irvine, California 92602.

44.   Defendant Investlinc Wealth Services, Inc. is, and at all material times represented that it was a California – domestic corporation ("Investlinc").

45.   Defendant InvestLinc may be served by first class mail postage prepaid upon its agent: West A. Cohan, 10 Pointe Drive, Suite 150, Brea, California 92821.

6

46.     Unless separately identified herein, all of the Defendants will collectively be referred to herein as the "Oxford Knox Defendants."

### GENERAL ALLEGATIONS

**A.     The Bankruptcy Case**

47.     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

48.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

49.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

50.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations

#63391135v2

omitted)).

51.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

52.     Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.     <u>Protective Order</u>**

53.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

54.     On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **<u>Exhibit 1</u>**, and incorporated herein.

55.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     <u>LPG's Ownership and Management</u>**

56.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

57.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

58.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

59.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

60.     LPG mismanaged the consumers' monthly payments.

8

61.    Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

62.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

63.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

64.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

65.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

66.    Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan"), B.A.T. Inc. dba Coast Processing ("Coast"), PrimeLogix, LLC ("PrimeLogix") and others to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

## SPECIFIC ALLEGATIONS

**A.    Ponzi Scheme Presumption**

67.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

68.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to

9

defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

69.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17

#63391135v2

(citations omitted).

70.    Diab improperly used Debtor to operate a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

11

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

71.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co*.), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

72.    "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

73.    In addition to the solicitation of investments and lending from the Oxford Knox Defendants, the Debtor's need for capital was so severe that it began borrowing funds through a loan broker named Spot On Consulting, Inc. ("Spot On"). Upon information and belief, Spot On would facilitate loans to LPG from individuals and corporations – sometimes for as little as $5,000 – in exchange for a ten percent (10%) commission on the principal amount of the loan. LPG would then typically promise to pay each lender as much as eight percent (8%) interest per month on the principal balance for twelve months and would then repay the original principal amount at maturity.

74.    Upon further information and belief, LPG borrowed hundreds of thousands of dollars **each week** on these terms beginning in August 2022 and continuing until filing for bankruptcy.

75.    Proof of Claim No. 91 seeking more than $66 million dollars has been filed for the outstanding balances owed on these brokered "loans". This Proof of Claim is incorporated by

#63391135v2

reference herein.

76. Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the Transfers to the Defendants were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were actually fraudulent as to the Debtor's creditors..

**B.** **Prepetition Litigation and Creditors**

77. Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

78. The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

79. At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

80. Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million in claims filed.

81. Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects

#63391135v2

1  15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18,

2  2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No.

3  613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice*

4  *Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

5  **C.    Debtor's Insolvency**

6        82.    Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1

7  statements reflecting secured liens against the Debtor's owned and after-acquired assets and the

8  assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-

9  priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of

10  creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest

11  point, $17.9 million of assets in November 2021.

12        83.    Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy

13  Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No.

14  06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi

15  scheme is proven, then the debtor is proven insolvent from the time of its inception").

16                              **SPECIFIC ALLEGATIONS**

17        84.    Upon information and belief, Oxford Knox and its predecessor Validation were formed

18  to try to meet promises made to investors and lenders to or partners of the Debtor and/or a related

19  entity. Whether these debts arose from traditional loans, "purchases" of receivables from a set of client

20  files, or investments in the Debtor or a particular venture, the Debtor, Tony Diab, and/or a related

21  entity was not able to fulfill the promised obligations.

22        85.    Some Oxford Knox Defendants appear to have lent money to Tony Diab. In the

23  summer of 2021, Defendants Home Energy, Samson Ly, BEW Solar, Spectrum, and others

24  collectively paid more than $1,000,000 into escrow to fund the down payment on Tony Diab's

25  purchase of Arash Bayrooti's shares in Coast. These escrowed funds were ultimately paid to Mr.

26  Bayrooti on behalf of Mr. Diab; however, the Debtor, and not Mr. Diab, was required to make these

27  payments.

28        86.    Upon information and belief, some amounts may have been repaid to these individuals

that advanced money to fund Mr. Diab's purchase of shares in Coast. These debts may have been restructured into assignments of income from groups of files.

87.    Also in 2021, Validation LLC was formed and entities affiliated with some or all of the Defendants were named as members.  Upon information and belief, Validation's stated purpose was to support the Debtor's marketing affiliates and/or work with law firms like the Debtor. Upon further information and belief, Validation's true purpose and goal was the repayment of amounts owed to its members by the Debtor or Mr. Diab.

88.    Validation was ultimately dissolved in September 2022, but while it operated, the Debtor paid it almost one million dollars as shown herein.

89.    While Validation was winding down, Mr. Diab formed a new entity – Oxford Knox – in late 2021. Upon information and belief, Oxford Knox was formed for the same purpose as Validation – to nominally support to the Debtor's affiliates while collecting payments from the Debtor for its members.

90.    The initial members of Oxford Knox were (i) Buffalo 21; (ii) Obrick, Inc.; (iii) Albright, Inc.; (iv) Final Season, Inc.; (v) Factor In, Inc.; (vi) Bae Enterprises, Inc.; (vii) Decacorn Holdings; (viii) BEW Solar; (ix) Lexicon Consulting, LLC; (x) United Partnerships; (xi) Ventura Consulting; and (xii) Summer Cederberg.

91.    Following its formation, the Debtor and/or Mr. Diab made payments directly to Oxford Knox, and/or its members using client funds paid to or collected by the Debtor.

92.    Upon further information and belief, Mr. Diab would direct the Debtor or a related entity to make or direct payments to one or more of the Oxford Knox Defendants either based on invoices for services that were never performed to make the payment appear tax deductible, or paid to a third party that was owned or controlled by a member of Oxford Knox.

93.    All payments to any Oxford Knox Defendant made pre-petition known to the Trustee as of the date the original complaint was filed are set forth on **Exhibit 2** hereto and incorporated as if set forth herein.

94.    All payments to any Oxford Knox Defendant made after the Debtor filed for bankruptcy known to the Trustee as of the date this complaint was filed are set forth on **Exhibit 3**

#63391135v2

1  hereto and incorporated as if set forth herein.

2  95.    Upon further information and belief, each member of Oxford Knox contributed "debt"

3  they claimed to be owed by the Debtor to the LLC. In turn, Oxford Knox, which was partially owned

4  and/or controlled by Tony Diab, entered into an agreement with the Debtor that fixed the debt owed

5  to Oxford Knox at $22,000,000 ("Repayment Agreement").

6  96.    The Repayment Agreement is the basis of, and is attached to, the Proof of Claim No.

7  818 ("Claim") filed by Oxford Knox herein. A true and accurate copy of the Repayment Agreement

8  from the Claim is attached hereto as **Exhibit 4**.

9  97.    The Claim states that Oxford Knox received three payments totaling $1,743,686.74 on

10  November 1, 2021, January 1, 2022, and February 1, 2022. The Trustee does not know if these

11  payments reflect payments made directly to the members of Oxford Knox or to third parties on their

12  behalf or if these payments were made directly to Oxford Knox from an unknown source. They are

13  identified herein and included in the Transfers that the Trustee seeks to avoid.

14  98.    Hereinafter, any payment to any Oxford Knox Defendant identified herein will be

15  referred collectively as the "Transfers". Specific sets of Transfers such as those made during the

16  ninety-day period preceding the Petition Date may be given a certain name, but they will remain part

17  of the Transfers identified herein.

18  99.    All Transfers identified herein may not relate to the transactions and entities discussed

19  herein, and the Trustee may have filed or may file separate litigation against one or more Defendants

20  based on other transactions or relationships it had with the Debtor. All Transfers to Defendant known

21  to the Trustee are identified herein out of an abundance of caution.

22  **CLAIMS FOR RELIEF**

23  **COUNT ONE**

24  **Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period**

25  **Before the Petition Date**

26  **[11 U.S.C. §§ 547, 550, and 551]**

27  100.    Plaintiff realleges and incorporates by reference each and every allegation contained

28  in the preceding paragraphs as though set forth in full herein.

16

101.    In the ninety-day period preceding the Petition Date, the Debtor made transfers of property or payments to one or more of the Oxford Knox Defendants ("90 Day Transfers"). The 90 Day Transfers to the Oxford Knox Defendants known to the Trustee as of the filing date are identified on hereto as **Exhibit 2.**

102.    The Debtor made the 90 Day Transfers to the Oxford Knox Defendants identified on the Exhibit on account of a debt owed to that particular Defendant or to Oxford Knox.

103.    The 90 Day Transfers were made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the 90 Day Transfers were payments made on account of debts nominally owed by the Debtor.

104.    A transfer of the Debtor's assets occurred when the 90 Day Transfers were received by the particular Oxford Knox Defendant.

105.    The 90 Day Transfers were made on account of antecedent debt nominally owed by the Debtor to the recipient of the Transfer due to an "investment" or other document evidencing indebtedness. The Debtor's payment obligations to the transferees constituted a "debt" (as defined in the Bankruptcy Code).

106.    The 90 Day Transfers occurred when the Debtor actually was insolvent. However, Plaintiff is also entitled to the presumption of insolvency when the 90 Day Transfers were made pursuant to 11 U.S.C. § 547(f).

107.    The 90 Day Transfers were made in the ninety-day period before the Petition Date.

108.    To the extent any transfers were made by the Debtor to any Oxford Knox Defendant within the ninety-day period preceding the Petition Date and are not identified herein, Plaintiff reserves the right to avoid and recover such transfers pursuant to 11 U.S.C. §§ 547 and 550.

109.    As the holder of an unsecured claim(s) or as party who has not filed a claim, the payment of the 90 Day Transfers to one or more of the Oxford Knox Defendants enabled them to recover more than they would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the 90 Day Transfers had not been made; and (iii) the debts owed to the Oxford Knox Defendants that received the 90 Day Transfers were paid pursuant to the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case,

17

as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

110.    In accordance with the foregoing, the 90 Day Transfers are avoidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT TWO

### Avoidance, Recovery, and Preservation of Post-Petition Transfers

### [11 U.S.C. §§ 549, 550, and 551]

111.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

112.    This is an action to pursuant to 11 U.S.C. §§ 549 and 550 to avoid and recover unauthorized post-petition transfers made by Debtor to any of the Oxford Knox Defendants ("Post-Petition Transfers").

113.    To the extent any Post-Petition Transfers were made by the Debtor to any Oxford Knox Defendant following the Petition Date and are not identified herein, Plaintiff reserves the right to amend the Complaint to identify the Post-Petition Transfers and seek the avoidance and recovery of them pursuant to 11 U.S.C. §§ 549 and 550.

114.    Those Post-Petition transfers to Oxford Knox Defendants that are known to the Trustee at this time are identified on **Exhibit 3** hereto.

## COUNT THREE

### Avoidance of Debtor's Execution of Repayment Agreement with Oxford Knox As a

### Fraudulent Conveyance

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

115.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

116.    11 U.S.C. § 548(a)(1)(B), in relevant part, permits a debtor or trustee to avoid "any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date

18

of the filing of the petition" if the debtor failed to receive reasonably equivalent value in exchange for such transfer or obligation and if the debtor:

(I)      was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)      was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III)      intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . .

117.     The Debtor executed the Repayment Agreement on or about April 15, 2022, which was within Two-Years of the Petition Date.

118.     On or after the date that the Repayment Agreement was executed, the Debtor was or became indebted to the Prepetition Creditors.

119.     The Repayment Agreement was executed while the Debtor:

a.      was insolvent or became insolvent as a result;

b.      was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.      intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

120.     The Debtor failed to receive reasonably equivalent value when it executed the Repayment Agreement because the Repayment Agreement purported to consolidate debt owed to the members of Oxford Knox into a single obligation of twenty-two million dollars ($22,000,000.00). Upon information and belief, the stipulated amount of debt is inflated as (i) the Debtor was not liable for some of the debts allegedly owed to the members of Oxford Knox that were reduced to a sum certain in the Repayment Agreement, (ii) the debts allegedly owed to the Members represented equity investments in entities related to the Debtor that were subsequently treated as debt in the Repayment Agreement; and/or (iii) the debts owed to the Members consolidated in the Repayment Agreement arose from illegal or otherwise voidable transactions such as file purchases.

#63391135v2

121.    The Repayment Agreement's requirement that the Debtor pay Oxford Knox the sum of ten million dollars ($10,000,000.00) upon a sale of the business is additional evidence that the debts the Members claimed to be owed were truly equity investments and not debt.

## COUNT FOUR

**Avoidance, Recovery, and Preservation of Two-Year Transfers Made With Intent to Defraud**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

122.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

123.    The Transfers were property of the Debtor's Estate prior to their conveyance to the one or more of the Oxford Knox Defendants. The Transfers to the Oxford Knox Defendants made within Two-Years of the Petition Date ("Two-Year Transfers") that are known to the Trustee are identified on **Exhibit 2** hereto and incorporated by reference herein.

124.    When the Two-Year Transfers were made, the Debtor was or became indebted include the Prepetition Creditors.

125.    The Two-Year Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

126.    The Two-Year Transfers to the Oxford Knox Defendants were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

127.    The Two-Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

128.    The Two-Year Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT FIVE**

**Avoidance, Preservation, and Recovery of Constructively Fraudulent Two-Year Transfers**

**11 U.S.C. §§ 548(a)(1)(B), 550 & 551**

129.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

130.    The Two-Year Transfers were made within Two-Years before the Petition Date.

131.    Debtor did not receive reasonably value in exchange for the Two-Year Transfers because (i) the Debtor was not liable on the debts originally owed to some Defendants, (ii) the debts allegedly owed to one or more Defendants arose from equity investments in entities related to the Debtor that were subsequently treated as the Debtor's debt.

132.    The Two-Year Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

133.    When the Two-Year Transfers occurred, Debtor's business was undercapitalized, and Debtor was engaged in business for which its capital was unreasonably small.

134.    When the Two-Year Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was consistently borrowing money from merchant cash advance lenders, purporting to sell the same groups of receivables to multiple parties, and as of August 2022 had begun a Ponzi scheme of borrowing through Spot On as discussed herein.

135.    At the time each Two-Year Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Two-Year Transfer and on the Petition Date.

136.    Plaintiff alleges that Defendants did not receive the Two-Year Transfers in good faith, for value, and without knowledge of their avoidability.

137.    Each Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, each Defendant demanded and received payment from client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from a payment processor for the Debtor such that the funds were never

#63391135v2

1  conveyed to the Debtor and placed in escrow.

2      138.    Each Defendant had to know or should have known that they were being paid with

3  client funds that had not been placed into trust and been disbursed before they were earned.

4      139.    Each Defendant knew or should have known that were receiving payment on a debt

5  that was not valid or enforceable at law to the extent it arose from an alleged "purchase" of receivables

6  related to the Debtor's client files.

7      140.    Based on the foregoing, Plaintiff may recover and preserve the avoided Two-Year

8  Transfers from Defendant as the initial transferee or, alternatively, as the subsequent transferee for

9  the benefit of the Estate under 11 U.S.C. §§ 550 and 551 from Defendant.

10                              **COUNT SIX**

11      **Avoidance, Preservation, and Recovery of Transfers Made In the Past Four Years**

12          **11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

13      141.    Plaintiff realleges and incorporates by reference each and every allegation contained

14  in the preceding paragraphs as though set forth in full herein.

15      142.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor

16  which are voidable under applicable law by an unsecured creditor of Debtor, including under

17  California Civil Code §§ 3439.04(a)(1) and 3439.05.

18      143.    The Transfers occurred within four years prior to the Petition Date and are identified

19  on **Exhibit 2**.

20      144.    On or after the date that such Transfer were made, entities to which Debtor was or

21  became indebted include the Prepetition Creditors.

22      145.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to

23  Defendants.

24      146.    The Transfers to Defendants were made with actual intent to hinder, delay or defraud

25  the creditors of Debtor as the Debtor was operating a Ponzi scheme.

26      147.    Defendants' conduct relating to the Transfers was done with oppression, fraud and

27  malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive

28  damages.

#63391135v2

148.     The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

149.     Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

150.     Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

151.     Debtor did not receive reasonably equivalent value in exchange for the Transfers. The Transfers were made to (i) entities that were not creditors of the Debtor, (ii) entities that had made equity or other investments with the Debtor or in assets, and (iii) entities who claimed to be owed far more than any value that was ever given to the Debtor.

152.     At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

153.     At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

154.     At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

155.     The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

156.     Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

23

157.    Each Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, each Defendant demanded and received payment from client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from a payment processor for the Debtor such that the funds were never placed in trust.

158.    Each Defendant had to know or should have known that they were being paid with client funds that had not been placed into trust and been disbursed before they were earned.

159.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

160.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

<u>**COUNT SEVEN**</u>

**Avoidance, Recovery, and Preservation of Transfers Made in the Past Four Years**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

161.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

162.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

163.    The Transfers were made within four years of the Petition Date are identified on **Exhibit 2** and incorporated as if set forth herein.

164.    Debtor did not receive reasonably equivalent value in exchange for the Transfers as (i) the Debtor was not liable on the debts originally owed to some Defendants, (ii) the debts allegedly owed to one or more Defendants arose from equity investments in entities related to the Debtor that were subsequently treated as the Debtor's debt.

165.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

166.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

167.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

168.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

169.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

170.    Each Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned.

171.    Each Defendant had to know or should have known that they were being paid with client funds that had not been placed into trust and been disbursed before they were earned.

172.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

173.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

## COUNT EIGHT

**Avoidance, Recovery, and Preservation of Fraudulent Transfers Made to or for the Benefit of Defendants Gilani and Dovalina Arising from use of American Express Card**

**[11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), and 550]**

174.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

175.    On or about November 28, 2021 the Debtor applied for a business platinum card from American Express ("AmEx").

176.    AmEx granted the Debtor's application and opened a credit line ending in 8-51001

#63391135v2

("Account") in the name of "LPG PC." AmEx issued cards to three individuals on this Account: Dovalina, Gilani, and Diab.

177.    From the opening of the Account in early 2022 to May and June 2022, Gilani regularly charged hundreds of thousands of dollars to the Account each month.

178.    While some charges to the Account may have been related to the Debtor and its operations, most of the charges do not appear to have benefitted the Debtor or were not incurred for the Debtor.

179.    Upon information and belief, Gilani regularly charged hundreds of thousands of dollars on the Account each month to pay vendors that do not appear to have done any work for the Debtors.

180.    Other expenses charged to the Account by Dovalina and/or Gilani appear personal in nature such as charges at clothing stores, tours/tickets, and dining.

181.    The charges made by each cardholder were itemized separately on the statements from American Express. The monthly charges on the Account for Dovalina and Gilani are stated below.

| Statement Closing Date | Gilani | Dovalina |
|---|---|---|
| 01.19.2022 | $14,812.41 | $1,593.83 |
| 02.16.2022 | $215,948.66 | $2,146.22 |
| 03.18.2022 | $207,846.79 | $1,413.61 |
| 04.18.2022 | $7,349.69 | $3,088.72 |
| 05.19.2022 | $29.98 | $94.55 |
| | $445,987.53 | $8,336.93 |

182.    The Debtor made payments on the Account to American Express. The payments from the Debtor to American Express to pay for all charges on the Account are identified on **Exhibit 5**.

183.    A significant portion of the payments to Am Ex were made to or for the benefit of Gilani and/or Dovalina and provided no benefit to the Debtor. The portion of the total payments made to AmEx that were made to pay for charges made to or for the benefit of Gilani and/or Dovalina are referred to herein as the "AmEx Transfers."

184.    The AmEx Transfers were made to or for the benefit of Gilani and/or Dovalina to the extent they paid American Express for charges made to the Account that were only or primarily for the benefit of Gilani and/or Dovalina.

26

185.    The funds used to make the AmEx Transfers were property of the Debtor's Estate prior to their conveyance to American Express.

186.    The AmEx Transfers occurred within the Two-Years prior to the Petition Date.

187.    On or after the date that the AmEx Transfers were made the Debtor was or became indebted include the Prepetition Creditors.

188.    The AmEx Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the AmEx Transfers.

189.    The AmEx Transfers were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

190.    Debtor did not receive reasonably value in exchange for the AmEx Transfers as Gilani and Dovlina were the parties that made charges on the Account for their personal benefit.

191.    When the AmEx Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

192.    When the AmEx Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was having to borrow money regularly from merchant cash advance lenders and to accept "investments" from third parties in exchange for promised future returns.

193.    At the time each AmEx Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

194.    Based on the foregoing, the AmEx Transfers were constructively fraudulent as to the Debtor's creditors to the extent they were made to or for the benefit of Gilani and/or Dovalina.

195.    Based on the foregoing, Plaintiff may avoid, preserve, and recover the avoided AmEx Transfers from Gilani and Dovalina pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B); 550 and 551.

### <u>COUNT NINE</u>

### Objection to Proof of Claim No. 818 of Oxford Knox, LLC

### [11 U.S.C. § 502(b) and (d)]

196.    Plaintiff realleges and incorporates by reference each and every allegation contained

27

in the preceding paragraphs as though set forth in full herein.

197.   11 U.S.C. § 502(b) permits a Bankruptcy Court to determine the amount of a proof of claim following the filing of an objection.

198.   The Trustee has asked the Court to avoid the Debtor's execution of the Repayment Agreement as a fraudulent conveyance pursuant to 11 U.S.C. § 548. The Repayment Agreement is the basis for Oxford Knox's Claim.

199.   If the Trustee's avoidance action is successful, the Repayment Agreement would not be enforceable against the Estate.

200.   The Oxford Knox Claim is also objected to and is subject to disallowance pursuant to 11 U.S.C. § 502(d) because Oxford Knox and its members that created the Claim received transfers that are avoidable under 11 U.S.C. §§ 544, 547, 548, and/or 549.

201.   The amount of the amount of the transfers identified herein has not been returned to the Estate.

**On All Claims for Relief:**

1.   Avoiding the Debtor's obligations under the Agreement and avoiding recovering, and preserving the Payments to the Defendant in such amounts as the Court may determine ("AmEx Transfers");

2.   Awarding pre-judgment and post-judgment as permitted;

3.   Granting any other and such further relief as the Court deems just and proper.

4.   Awarding attorneys' fees as provided by contract or applicable law;

5.   Awarding costs of suit incurred here; and

6.   Granting any other and further relief as the Court deems just and proper.

**On the First and Second Claims for Relief:**

1.   Avoiding, recovering, and preserving the 90 Day Transfers and Post-Petition Transfers to the Defendants in such amounts as the Court may determine pursuant to applicable law;

**On the Third Claim for Relief:**

2.   Avoiding and preserving the Debtor's execution of the Repayment Agreement as a fraudulent conveyance pursuant to 11 U.S.C. §§ 548, 550, and 551 for the reasons stated herein;

28

**On the Fourth Through Eight Claims for Relief:**

3.    Avoiding, recovering, and preserving the Transfers to the Defendants in such amounts as the Court may determine pursuant to applicable law;

**On the Ninth Claim for Relief:**

4.    Sustaining the Plaintiff's Objection to the Claim of Oxford Knox for the reasons stated herein;

**On All Claims for Relief:**

5.    Awarding punitive and exemplary damages according to proof;

6.    Awarding pre-judgment interest at the maximum legal rate;

7.    Awarding post-judgment interest at the maximum legal rate from the date of the last Transfer until the judgment is paid in full;

8.    Awarding costs of suit incurred herein; and

9.    Granting any other and further relief as the Court deems just and proper.

Dated:  August 13, 2025                    Respectfully submitted,

DINSMORE & SHOHL LLP


By:  /s/ Tyler Powell
     Tyler Powell (pro hac vice)
     Yosina M. Lissebeck
Attorneys for Richard A. Marshack, Trustee of the
LPG Liquidation Trust

#63391135v2

# EXHIBIT 1

Exhibit 1
Page 30

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele:  619.400.0500
7  Fax:  619.400.0501

8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
10 101 S. Fifth Street, Suite 2500
   Louisville, Kentucky 40202
11 Tele: 859-425-1096
   Fax: 502-585-2207
12 (Admitted pro hac vice)

13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

14  **UNITED STATES BANKRUPTCY COURT**

15  **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16  In Re

17

18
    The Litigation Practice Group P.C.,
19
                    Debtor(s),
20

21

22

23

24

25

26

27

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR
ENTRY OF PROTECTIVE ORDER AND
THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
         411 West Fourth Street
         Santa Ana, CA 92701

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 31

1    The Court has read and considered the Notice of Motion and Motion for Entry of Protective

2 Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the

3 "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024,

4 pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1),

5 as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

6    IT IS HEREBY ORDERED that:

7    1.    The Motion is granted;

8    2.    The below Protective Order shall apply to any contested matter arising

9    in the main bankruptcy case and in all adversary proceedings filed by or against Trustee,

10    present and future; and

11    3.    Govern the discovery conducted therein.

12

13    **PROTECTIVE ORDER**

14    **1.    DEFINITIONS**

15    1.1    "Confidential Information" as used in this Protective Order shall mean documents and

16 other information (regardless of how generated, stored or maintained) that a Party or non-party

17 reasonably believes to contain or reflect non-public financial or business information, bank records,

18 financial records, such as social security numbers, non-public financial or personal information of a

19 Party or non-party, account numbers, sensitive digital information and identifiers, information subject

20 to confidentiality agreements or provisions other than this Protective Order, and other non-public

21 research, development, or commercial information that derives value or avoids injury by virtue of not

22 being known to the public.

23    1.2    This "Action" is defined and hereby means any contested matter arising in the main

24 bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

25    1.3    "Designating Party" means a Party or non-party that designates Confidential

26 Information during the Action.

27    1.4    "Receiving Party" means a Party that receives Confidential Information during the

28 Action.

Exhibit 1
Page 32

1     1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2    **2.**     **SCOPE OF THIS PROTECTIVE ORDER**

3    2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and

4 other products of discovery obtained in the Action from the Parties there to, and from third parties.

5 As well as certain information copied or derived therefrom, excerpts, summaries or compilations

6 thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement

7 discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal

8 Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure,

9 answers to interrogatories, deposition transcripts, responses to requests for production, responses to

10 requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material

11 and information as may be produced during the course of the Action and designated as Confidential

12 Information.

13    **3.**     **DESIGNATION OF CONFIDENTIAL INFORMATION**

14    3.1    This Protective Order shall govern the production and handling of any Confidential

15 Information in this Action. Any Party or non-party who produces Confidential Information in this

16 Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this

17 Protective Order. Whenever possible, the Designating Party must designate only those portions of a

18 document, written discovery responses, deposition, transcript, or other material that contain the

19 Confidential Information and refrain from designating entire documents. Regardless of any

20 designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure

21 of its Confidential Information outside of this Action or for any business purposes. In addition, any

22 Party may move to modify or seek other relief from any of the terms of this Protective Order if it has

23 first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party

24 as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order

25 shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure

26 and utilizing the documents as needed through-out the Action.

27    3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or

28 materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

1  must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if

2  it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of

3  designated information as permitted hereunder to the non-party. If a non-party wishes to make

4  designations hereunder, it must first sign attached <u>Exhibit A.</u>

5        **3.3**     <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be

6  made at any time. To avoid potential waiver of protection hereunder, the Designating Party should

7  designate documents or materials containing Confidential Information at the time of production or

8  disclosure, including on the record during the taking of any deposition. Deposition testimony will be

9  deemed provisionally protected for a period of thirty (30) days after the transcript is released to the

10  Parties by the court reporter, although the Parties may agree at any time to different timelines of

11  provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more

12  specific depositions. To retain any designations beyond the provisional period, a Designating Party

13  must designate specific pages and lines of deposition testimony before the provisional period has

14  expired. Such designations must be made in writing so that all counsel and court reporters may append

15  the designation to all copies of the transcripts.

16        **3.4**     <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any

17  reasonable manner or method that notifies the Receiving Party of the designation level and identifies

18  with specificity the information to which the designation applies. If made verbally, the Designating

19  Party must promptly confirm the designation in writing. Whenever possible, the Designating Party

20  should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on

21  each designated page of the document or electronic image that contains Confidential Information.

22        **4.**      **CHALLENGES TO DESIGNATED INFORMATION**

23        **4.1**     In the event that a Receiving Party disagrees at any time with any designation(s) made

24  by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith

25  on an informal basis with the Designating Party. The Receiving Party must provide written notice of

26  the challenge and the grounds therefor to the Designating Party, who must respond in writing to the

27  challenge within fifteen (15) days. At all times, the Designating Party carries the burden of

28  establishing the propriety of the designation and protection level. Unless and until the challenge is

1   resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2   under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3   constitute a concession that the designation is proper or an admission that the designated information

4   is otherwise competent, relevant, or material.

5        **5.**      **LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6       5.1   <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7   and designated under this Protective Order may be used for preparation for trial and preparation for

8   any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9   other purpose, without the written consent of the Designating Party. No Confidential Information may

10   be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11   parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12   Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13   of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14   not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15   any subpoena that seeks production or disclosure of any designated information and consulting with

16   the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17   Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18   disclosing person or party to sanctions.

19       5.2   <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20   Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21   reviewed by the following:

22       a)      The Court, its personnel, and court reporters;

23       b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a

24   joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25   in the Action and are informed of the duties and obligations imposed hereunder;

26       c)      The Parties, including their clients, agents and employees who are assisting or have

27   reason to know of the Action;

28   / / /

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)    Other witnesses or persons with the Designating Party's consent or by court order.

5.3    Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)    In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)    Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4    Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5    In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

the Court's case-management or other pre-trial order, or by a motion *in limine*. Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

**7.     DURATION/CONTINUED RESTRICTIONS**

7.1     <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2     <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.     PRIVILEGED OR PROTECTED INFORMATION**

8.1     Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2     If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

EXHIBIT "A"

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14                  **UNITED STATES BANKRUPTCY COURT**

15                  **CENTRAL DISTRICT OF CALIFORNIA**

16

17 In Re                              Case No. 8:23-BK-10571-SC

18
                                      Chapter 11
19
   The Litigation Practice Group P.C.,   **EXHIBIT A TO STIPULATED**
20                                        **ORDER**
            Debtor(s),
21                                      Date:  May 23, 2024
22                                      Time:  1:30 p.m.
                                        Judge:  Hon. Scott C. Clarkson
23                                      Place:  Courtroom 5C[1] - Via Zoom
24                                              411 W. Fourth Street
                                                Santa Ana, CA  92701
25

26

27
   ────────────────────
   [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28   publicly posted hearing calendar, which may be viewed online at:
     http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                      1                    Exhibit 1
                                                           Page 41

This is to certify that:

(a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

(b)    I have read the Stipulated Protective Order; and

(c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

2

Exhibit 1
Page 42

# EXHIBIT 2

Exhibit 2
Page 43

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| **Oxford Knox, LLC** | UnionBank | The Litigation Practice Group PC | X4858 | 12/28/2021 | | $30,179.55 | N |
| **Oxford Knox, LLC** | Chase | The Litigation Practice Group PC | X3158 | 7/29/2022 | | $10,000.00 | N |
| | | | | | Total | **$40,179.55** | |
| **Buffalo 21 Partners Inc.** | UnionBank | The Litigation Practice Group PC; IOLTA | X4874 | 1/13/2022 | 122 | $54,753.19 | N |
| | | | | | Total | **$54,753.19** | |
| **Jason Dovalina** | Chase | Vulcan Consulting Group LLC | X3588 | 4/1/2021 | 1032 | $11,250.00 | N |
| **Jason Dovalina** | Bank of the West | The Litigation Practice Group PC | X3441 | 5/4/2021 | | $55,000.00 | N |
| **Jason Dovalina** | Chase | Vulcan Consulting Group LLC | X3588 | 5/13/2021 | | $20,000.00 | N |
| **Jason Dovalina** | Chase | Vulcan Consulting Group LLC | X5909 | 8/18/2021 | | $25,000.00 | N |
| **Jason Dovalina** | American Express | LPG PC; Syed Gilani | X1001 | 12/19/2021 | | $300.00 | N |
| **Jason Dovalina** | American Express | LPG PC; Syed Gilani | X1001 | 12/19/2021 | | $350.00 | N |
| | | | | | Total | **$111,900.00** | |
| **Sye Gilani** | Chase | Vulcan Consulting Group LLC | X3588 | 3/15/2021 | | $45,000.00 | N |
| **Sye Gilani** | Chase | Vulcan Consulting Group LLC | X3588 | 4/1/2021 | | $45,000.00 | N |
| **Sye Gilani** | Bank of the West | The Litigation Practice Group PC | X3441 | 4/19/2021 | 1021 | $60,000.00 | N |
| **Sye Gilani** | Chase | Vulcan Consulting Group LLC | X3588 | 5/5/2021 | 4490 | $30,000.00 | N |
| **Sye Gilani** | Chase | Vulcan Consulting Group LLC | X3588 | 5/12/2021 | 4492 | $50,000.00 | N |
| **Sye Gilani** | Chase | Vulcan Consulting Group LLC | X3588 | 5/13/2021 | | $90,000.00 | N |
| **Sye Gilani** | Bank of the West | The Litigation Practice Group PC | X3441 | 6/2/2021 | 1124 | $16,000.00 | N |
| **Sye Gilani** | Chase | Vulcan Consulting Group LLC | X3588 | 6/2/2021 | 1012 | $108,000.00 | N |
| **Sye Gilani** | UnionBank | The Litigation Practice Group PC | X4858 | 2/11/2022 | | $5.02 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 2/18/2022 | | $7.16 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 2/25/2022 | | $13.82 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 3/4/2022 | | $7.52 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3158 | 3/4/2022 | 10989 | $8,000.00 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 3/18/2022 | | $3.79 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 3/24/2022 | | $12.18 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 4/18/2022 | | $3.79 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 4/21/2022 | | $5.02 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 4/28/2022 | | $14.06 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 5/19/2022 | | $3.79 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 6/16/2022 | | $3.79 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 6/30/2022 | | $14.06 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 7/8/2022 | | $7.52 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 7/14/2022 | | $3.79 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 7/29/2022 | | $7.16 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 8/19/2022 | | $3.79 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 8/26/2022 | | $7.16 | N |
| **Sye Gilani** | Chase | The Litigation Practice Group PC | X3133 | 9/2/2022 | | $7.50 | N |
| | | | | | Total | **$452,130.92** | |
| **Samson Ly** | Chase | The Litigation Practice Group PC | X3158 | 11/28/2022 | 1272 | $20,000.00 | N |
| **Samson Ly** | Chase | The Litigation Practice Group PC | X3158 | 12/21/2022 | 1277 | $20,000.00 | Y |
| **Samson Ly** | Chase | The Litigation Practice Group PC | X3158 | 12/21/2022 | 1278 | $20,000.00 | Y |
| | | | | | Total | **$60,000.00** | |
| **Bew Solar Management LLC** | Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | | $6,286.87 | N |
| **Bew Solar Management LLC** | Chase | The Litigation Practice Group PC | X3158 | 1/19/2022 | | $7,463.63 | N |
| **Bew Solar Management LLC** | Chase | The Litigation Practice Group PC | X3158 | 2/28/2022 | 11031 | $2,964.29 | N |
| | | | | | Total | **$16,714.79** | |

Exhibit 2
Page 44

Exhibit 2
Page 45

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| Lexicon Consulting LLC | Optimum Bank | Coast Processing LLC dba LPG | X6738 | 12/2/2021 | 320 | $5,074.94 | N |
| Lexicon Consulting LLC | UnionBank | The Litigation Practice Group PC | X4858 | 1/10/2022 | | $180,000.00 | N |
| Lexicon Consulting LLC | UnionBank | The Litigation Practice Group PC | X4858 | 2/4/2022 | | $215.90 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 2/18/2022 | | $581.18 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 2/25/2022 | | $397.08 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 3/4/2022 | | $832.46 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 3/10/2022 | | $2,078.67 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 3/18/2022 | | $941.92 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 3/24/2022 | | $907.91 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 4/1/2022 | | $1,582.53 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 4/7/2022 | | $2,415.60 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 4/18/2022 | | $2,412.47 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 4/21/2022 | | $962.49 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 4/28/2022 | | $411.84 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 5/5/2022 | | $321.33 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 5/13/2022 | | $589.32 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 5/19/2022 | | $801.91 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 5/27/2022 | | $142.18 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 6/3/2022 | | $472.08 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 6/10/2022 | | $423.92 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 6/16/2022 | | $799.39 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 6/30/2022 | | $475.49 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 7/8/2022 | | $246.71 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 7/14/2022 | | $430.75 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 7/21/2022 | | $218.09 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 8/5/2022 | | $341.27 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 8/11/2022 | | $103.62 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 8/19/2022 | | $495.15 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 9/2/2022 | | $50.00 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 9/9/2022 | | $280.83 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 9/16/2022 | | $590.95 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 9/23/2022 | | $218.09 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 10/6/2022 | | $193.57 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 10/14/2022 | | $428.53 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 10/21/2022 | | $347.61 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 11/10/2022 | | $244.89 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 11/18/2022 | | $184.45 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 11/25/2022 | | $91.28 | N |

Exhibit 2
Page 46

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 12/9/2022 | | $155.12 | N |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 12/19/2022 | | $283.96 | Y |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 12/27/2022 | | $81.33 | Y |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 12/30/2022 | | $9.95 | Y |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 1/6/2023 | | $155.12 | Y |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 1/24/2023 | | $283.96 | Y |
| Lexicon Consulting LLC | Chase | The Litigation Practice Group PC | X3133 | 2/7/2023 | | $81.33 | Y |
| Lexicon Consulting LLC | Bank of America | Litigation Practice Group PC | X6538 | 2/9/2023 | | $136.28 | Y |
| | | | | | Total | $208,493.45 | |

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| United Partnerships LLC | Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | | $15,149.08 | N |
| United Partnerships LLC | UnionBank | The Litigation Practice Group PC; IOLTA | X94874 | 1/14/2022 | 129 | $17,912.71 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 3/8/2022 | | $7,142.86 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 3/23/2022 | | $20,000.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 4/8/2022 | | $10,000.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 7/22/2022 | | $60,000.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 8/12/2022 | | $20,025.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 8/16/2022 | | $20,025.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 8/19/2022 | | $41,158.45 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 8/23/2022 | | $20,025.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 8/24/2022 | | $31,000.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 8/25/2022 | | $20,025.00 | N |
| United Partnerships LLC | Chase | LPG; Alex Tarkoff | X0935 | 8/31/2022 | | $9,200.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/6/2022 | | $32,971.70 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/8/2022 | | $27,656.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/8/2022 | | $20,025.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/9/2022 | | $20,025.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/9/2022 | | $14,180.00 | N |
| United Partnerships LLC | Chase | LPG; Alex Tarkoff | X0935 | 9/9/2022 | | $9,200.00 | N |
| United Partnerships LLC | Chase | LPG; Alex Tarkoff | X0935 | 9/13/2022 | | $9,600.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/21/2022 | | $26,775.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/21/2022 | | $20,025.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/21/2022 | | $20,025.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/21/2022 | | $20,025.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/21/2022 | | $14,160.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/21/2022 | | $4,263.89 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 9/22/2022 | | $20,000.00 | N |
| United Partnerships LLC | Chase | LPG; Alex Tarkoff | X0935 | 9/22/2022 | | $5,488.89 | N |
| United Partnerships LLC | Chase | LPG; Alex Tarkoff | X0935 | 9/26/2022 | | $5,363.11 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/5/2022 | | $26,775.00 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/5/2022 | | $14,661.89 | |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/7/2022 | | $5,363.11 | N |

Exhibit 2
Page 47

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 10/13/2022 | | $46,859.95 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/14/2022 | | $25,875.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/14/2022 | | $20,025.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/14/2022 | | $20,000.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/20/2022 | | $46,859.95 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 10/20/2022 | | $20,025.00 | N |
| United Partnerships LLC | Chase | LPG; Alex Tarkoff | X0935 | 10/20/2022 | | $9,650.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 11/3/2022 | | $20,000.00 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 11/3/2022 | | $35,500.00 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 11/9/2022 | | $33,870.15 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 11/10/2022 | | $25,500.00 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 11/14/2022 | | $26,700.00 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 11/14/2022 | | $21,600.00 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 12/9/2022 | | $9,800.00 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 12/14/2022 | | $33,870.15 | N |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 12/14/2022 | | $17,375.00 | N |
| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
| United Partnerships LLC | Chase | The Litigation Practice Group PC | X3158 | 12/14/2022 | | $13,275.00 | N |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 12/20/2022 | | $35,500.00 | Y |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 12/20/2022 | | $22,075.00 | Y |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 12/23/2022 | | $11,760.00 | Y |
| United Partnerships LLC | Bank of America | Prime Logix LLC | X9201 | 1/9/2023 | | $12,510.00 | Y |
| United Partnerships LLC | Bank of America | Litigation Practice Group PC | X6457 | 1/10/2023 | | $17,375.00 | Y |
| United Partnerships LLC | Bank of America | Litigation Practice Group PC | X6457 | 1/10/2023 | | $3,406.00 | Y |
| United Partnerships LLC | Bank of America | Litigation Practice Group PC | X6457 | 1/12/2023 | | $31,500.00 | Y |
| United Partnerships LLC | Bank of America | Litigation Practice Group PC | X6457 | 1/12/2023 | | $20,000.00 | Y |
| United Partnerships LLC | Bank of America | Litigation Practice Group PC | X6457 | 1/12/2023 | | $20,000.00 | Y |
| United Partnerships LLC | Bank of America | Litigation Practice Group PC | X6457 | 1/12/2023 | | $17,375.00 | Y |

Exhibit 2
Page 48

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| **United Partnerships LLC** | Bank of America | Litigation Practice Group PC | X6457 | 2/10/2023 | | $100,000.00 | Y |
| **United Partnerships LLC** | Bank of America | Litigation Practice Group PC | X6486 | 2/15/2023 | | $50,000.00 | Y |
| **United Partnerships LLC** | UnionBank | The Litigation Practice Group PC | X4858 | 2/27/2023 | | $40,000.00 | Y |
| **United Partnerships LLC** | UnionBank | The Litigation Practice Group PC | X4858 | 2/28/2023 | | $11,000.00 | Y |
| **United Partnerships LLC** | Chase | BAT Inc. | X0830 | 3/16/2023 | | $21,000.00 | Y |
| **United Partnerships LLC** | UnionBank | The Litigation Practice Group PC | X4858 | 3/17/2023 | | $19,000.00 | Y |
| | | | | | Total | $1,467,532.89 | |

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| **Ventura Consulting, LLC** | UnionBank | The Litigation Practice Group PC | X4858 | 11/23/2021 | | $560,000.00 | N |
| **Ventura Consulting, LLC** | Chase | The Litigation Practice Group PC | X3158 | 3/8/2022 | | $16,678.57 | N |
| | | | | | | $576,678.57 | |

Exhibit 2
Page 49

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/1/2020 | | $3,000.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/10/2020 | | $3,000.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/15/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/30/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 10/14/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 10/30/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/12/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/23/2020 | | $10,000.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/30/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/1/2020 | | $750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/7/2020 | | $3,200.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/14/2020 | | $3,750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/14/2020 | | $750.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/14/2020 | | $4,500.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/30/2020 | | $4,500.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 1/5/2021 | | $1,000.00 | N |
| Matthew Church | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 1/6/2021 | | $14,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/15/2021 | | $5,250.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/25/2021 | | $3,275.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/29/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/29/2021 | | $2,250.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 2/2/2021 | | $10,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 2/10/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 3/1/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 3/5/2021 | | $6,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 3/10/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 3/22/2021 | | $5,000.00 | N |
| Matthew Church | Bank of the West | The Litigation Practice Group PC | X3441 | 3/29/2021 | 99007 | $1,023.89 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 3/29/2021 | | $5,500.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 3/31/2021 | | $3,750.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 4/2/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 4/5/2021 | | $2,500.00 | N |
| Matthew Church | Chase | Vulcan Consulting Group LLC | X3588 | 4/15/2021 | | $1,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 4/21/2021 | | $33,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 5/14/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 6/4/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 6/17/2021 | | $12,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 6/17/2021 | | $5,000.00 | N |
| Matthew Church | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 7/7/2021 | | $5,000.00 | N |
| | | | | | Total | $206,498.89 | |

Exhibit 2
Page 50

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 8/18/2020 | | $3,750.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/1/2020 | | $8,250.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/10/2020 | | $3,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/15/2020 | | $11,500.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/30/2020 | | $11,500.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 10/14/2020 | | $11,500.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 10/30/2020 | | $24,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/12/2020 | | $24,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/25/2020 | | $5,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/30/2020 | | $24,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/14/2020 | | $24,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/30/2020 | | $24,000.00 | N |
| Frank Brown | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 1/4/2021 | | $4,500.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/22/2021 | | $34,000.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/29/2021 | | $34,450.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 2/4/2021 | | $180,000.00 | N |
| Frank Brown | Bank of the West | The Litigation Practice Group PC | X3441 | 3/24/2021 | | $47,500.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 4/6/2021 | | $47,500.00 | N |
| Frank Brown | Bank of the West | The Litigation Practice Group PC | X3441 | 4/16/2021 | | $22,500.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 4/16/2021 | | $13,500.00 | N |
| Frank Brown | Bank of the West | The Litigation Practice Group PC | X3441 | 5/7/2021 | | $13,500.00 | N |
| Frank Brown | Chase | Vulcan Consulting Group LLC | X3588 | 5/11/2021 | | $22,500.00 | N |
| Frank Brown | Bank of the West | The Litigation Practice Group PC | X3441 | 5/14/2021 | | $36,000.00 | N |
| Frank Brown | Bank of the West | The Litigation Practice Group PC | X3441 | 5/25/2021 | 1039 | $625.00 | N |
| Frank Brown | Bank of the West | The Litigation Practice Group PC | X3441 | 5/26/2021 | | $2,108.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 6/4/2021 | | $36,000.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 7/2/2021 | | $2,100.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 8/4/2021 | | $50,000.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 8/24/2021 | | $22,500.00 | N |
| Frank Brown | Chase | Vulcan Consulting Group LLC | X3588 | 9/14/2021 | | $2,108.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/20/2022 | | $10,000.00 | N |
| Frank Brown | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 11/15/2022 | | $150,000.00 | N |
| | | | | | Total | $905,891.00 | |

Exhibit 2
Page 51

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| **Spectrum Payment Solution** | Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | | $64,383.60 | N |
| **Spectrum Payment Solution** | UnionBank | The Litigation Practice Group PC; IOLTA | X4874 | 1/13/2022 | 132 | $50,752.68 | N |
| **Spectrum Payment Solution** | Chase | The Litigation Practice Group PC | X3158 | 3/15/2022 | 1166 | $30,357.14 | N |
| | | | | | Total | $145,493.42 | |
| | | | | | | | |
| **Home Energy Solutions Inc** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/15/2020 | | $15,000.00 | N |
| **Home Energy Solutions Inc** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 5/17/2021 | | $30,000.00 | N |
| | | | | | Total | $45,000.00 | |
| **JNR Services, Inc.** | Chase | Vulcan Consulting Group LLC | X3588 | 4/22/2021 | | $37,000.00 | N |
| **JNR Services, Inc.** | Bank of the West | The Litigation Practice Group PC | X3441 | 5/17/2021 | 1.004E+09 | $31,500.00 | N |
| **JNR Services, Inc.** | Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | | $74,991.76 | N |
| **JNR Services, Inc.** | UnionBank | The Litigation Practice Group PC | X4858 | 11/23/2021 | | $250,000.00 | N |
| **JNR Services, Inc.** | UnionBank | The Litigation Practice Group PC; IOLTA | X4874 | 1/7/2022 | 124 | $40,919.74 | N |
| **JNR Services, Inc.** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/25/2022 | | $21,886.00 | N |
| **JNR Services, Inc.** | Chase | The Litigation Practice Group PC | X3158 | 2/10/2022 | | $20,000.00 | N |
| **JNR Services, Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/9/2022 | 1158 | $16,678.57 | N |
| **JNR Services, Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/22/2022 | | $25,000.00 | N |
| **JNR Services, Inc.** | Chase | The Litigation Practice Group PC | X3158 | 7/8/2022 | | $35,000.00 | N |
| **JNR Services, Inc.** | Chase | LPG VC; Alex Tarkoff | X6652 | 10/25/2022 | | $42,500.00 | N |
| **JNR Services, Inc.** | Chase | LPG VC; Alex Tarkoff | X6652 | 10/25/2022 | | $32,500.00 | N |
| **JNR Services, Inc.** | Chase | The Litigation Practice Group PC | X3158 | 11/15/2022 | | $23,000.00 | N |
| | | | | | Total | $650,976.07 | |
| | | | | | | | |
| **Cat Exteriors Inc** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 8/14/2020 | | $15,000.00 | N |
| **Cat Exteriors Inc** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/1/2020 | | $15,000.00 | N |
| **Cat Exteriors Inc** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/2/2020 | | $15,000.00 | N |
| | | | | | Total | $45,000.00 | |
| | | | | | | | |
| **AZLS Enterprises Inc.** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 7/6/2021 | | $130,226.82 | N |
| **AZLS Enterprises Inc.** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 8/6/2021 | | $22,500.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 9/21/2021 | | $65,000.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 9/22/2021 | | $90,400.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 10/1/2021 | 10288 | $23,076.92 | N |
| **AZLS Enterprises Inc.** | Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/8/2021 | | $218,400.00 | N |
| **AZLS Enterprises Inc.** | UnionBank | The Litigation Practice Group PC | X4858 | 11/23/2021 | | $250,000.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 1/3/2022 | 1121 | $100,000.00 | N |
| **AZLS Enterprises Inc.** | UnionBank | The Litigation Practice Group PC; IOLTA | X4874 | 1/7/2022 | 121 | $67,185.30 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 2/10/2022 | 1136 | $100,000.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/4/2022 | 1152 | $23,076.92 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/9/2022 | 1153 | $25,000.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/15/2022 | 1161 | $25,000.00 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/22/2022 | 1172 | $23,076.92 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 3/22/2022 | 1173 | $21,339.50 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 4/8/2022 | 1203 | $21,339.50 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 4/15/2022 | 1208 | $23,076.92 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 5/10/2022 | 1230 | $21,339.50 | N |
| **AZLS Enterprises Inc.** | Chase | The Litigation Practice Group PC | X3158 | 6/6/2022 | 11407 | $23,000.00 | N |
| | | | | | Total | $1,273,038.30 | |

Exhibit 2
Page 52

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Check Number | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|---|
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/1/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/15/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 9/30/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 10/14/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 10/29/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/12/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 11/30/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/14/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 12/30/2020 | | $3,000.00 | N |
| **Investlinc Wealth Services** | Wells Fargo | Vulcan Consulting Group LLC | X3193 | 1/6/2021 | | $20,000.00 | N |
| **Investlinc Wealth Services** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 4/19/2021 | | $6,000.00 | N |
| **Investlinc Wealth Services** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 5/7/2021 | | $6,000.00 | N |
| **Investlinc Wealth Services** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 5/14/2021 | | $1,500.00 | N |
| **Investlinc Wealth Services** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 6/4/2021 | | $4,500.00 | N |
| **Investlinc Wealth Services** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 6/17/2021 | | $4,500.00 | N |
| **Investlinc Wealth Services** | Optimum Bank | COAST PROCESSING LLC DBA LITIGATION PRACTICE GROUP | X6712 | 8/26/2021 | | $34,500.00 | N |
| | | | | | Total | $104,000.00 | |
| | | | | | | | |

Exhibit 2
Page 53

# EXHIBIT 3

Exhibit 3
Page 54

| Bank Name | Account Name | Account Number | Transaction Date | Debit/Charge | Payee | Post-Petition Transfer |
|---|---|---|---|---|---|---|
| Bank of America | Prime Logix LLC | X9201 | 4/6/2023 | $25,000.00 | United Partnerships LLC | Y |
| Bank of America | Prime Logix LLC | X9201 | 4/12/2023 | $20,000.00 | United Partnerships LLC | Y |
| Bank of America | Prime Logix LLC | X9201 | 5/1/2023 | $25,000.00 | United Partnerships LLC | Y |
| Bank of America | Prime Logix LLC | X9201 | 5/12/2023 | $35,000.00 | United Partnerships LLC | Y |
| | | | | | | |
| | | | **Total** | **$105,000.00** | | |

Exhibit 3
Page 55

# EXHIBIT 4

Exhibit 4
Page 56

## DEBT REPAYMENT AGREEMENT

This DEBT REPAYMENT AGREEMENT (this "***Agreement***") is executed as of April 15, 2022 (the "***Effective Date***"), by and between THE LITIGATION PRACTICE GROUP PC, a California law corporation (the "***Company***"), and  OXFORD KNOX, LLC, a Delaware limited liability company ("***Creditor***"). The Company and the Creditor may be collectively referred to as the "***Parties***," and individually as a "***Party***."

### RECITALS

WHEREAS, the Company is provides legal services to clients in connection with debt resolution of the clients' enrolled liabilities (the "***Business***");

WHEREAS, the Creditor has in the past provided, directly or indirectly through its members, contractors, affiliates and/or predecessors-in-interest, funding for the Company's operations, including funding for the recruitment, training and support related to marketing affiliates;

WHEREAS, despite good faith efforts, the Parties have been unable to establish the precise amount of the funding previously provided by the Creditor to the Company, and by way of compromise have agreed that Company is indebted to the Creditor in the amount of $22,000,000 (the "***Indebtedness***"); and

WHEREAS,  the Company and the Creditor have further agreed that the Indebtedness shall be satisfied and paid in full by (i) monthly payments set forth on Schedule 1 through October 2027; plus (ii) a balloon payment in the amount of $10,000,000, payable solely in the event of a Sale of Business (as defined below) with respect to the Company.

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Recitals. The statements contained in the recitals set forth above are true and correct and by this reference are made a part of this Agreement.

2.      Definitions. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms shall have the meanings indicated in this Section 2:

"***Net Proceeds from Sale of Business***" means the proceeds from a Sale of Business, as applicable, as determined after reduction for the following: (a) payment of all expenses related thereto, including any applicable commissions and other fees paid in connection therewith; and (ii) in the case of a Sale of Business, payments in satisfaction of any and all present and future indebtedness for borrowed money (other than the Indebtedness), obligations or liabilities of the Company.

"***Sale of Business***" means a sale, transfer, assignment, or other disposition by the Company or the Company's shareholders of all or substantially all of the Business.

3.      Debt Repayment. As payment in full of the Indebtedness, the Company agrees to make the following payments to the Creditor:

a.      Monthly Payments. The Company shall repay $12,000,000 of the Indebtedness in monthly installments in accordance with Schedule 1 through October 2027 or until a Sale of Business has occurred with respect to the Company, whichever comes first. Each such repayment installment shall be due and

Exhibit 4
Page 57

payable on or before the 15th business day of each month (or such other time as may be mutually agreed upon by the Parties), with the first payment having been made on November 4, 2021. The Indebtedness repayment schedule may be revised from time to time by mutual agreement of the Parties by executing and amendment to Schedule 1.

b.      Prepayments. The Company shall make monthly prepayments of the Indebtedness in the amount of Excess Cash Flow, as calculated by the Company in good faith consistent with past practice. Such prepayments shall be consistent with the Parties' agreement that the Company shall use commercially best efforts to repay the Indebtedness in its entirety by December 31, 2024.

c.      Balloon Payment. At the time of a Sale of Business, the Company shall make a balloon payment to the Creditor, in full satisfaction of the Indebtedness, in the amount of (i) $10,000,000, *plus* (b) if applicable, the principal outstanding amount at such time of the monthly installment obligations payable pursuant to Section 3(a), above together with the balance of any unpaid interest and other amounts payable thereunder (the "***Balloon Payment***"). The Balloon Payment shall be paid to the Creditor through the escrow or similar agreement, or arrangement established for such sale, provided, however, that the amount payable to the Creditor in the case of a Sale of Business pursuant to this Section 3(c) shall not exceed the Net Proceeds from Sale of Business.

4.      Representations and Warranties.

a.      The Company represents and warrants to the Creditor that (i) the Company is a California legal corporation duly organized, validly existing, and in good standing under the laws of the state of California, (ii) the Company has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (iii) the execution and delivery of this Agreement and the performance of the terms hereof by the Company have been duly authorized by all necessary action on the part of the Company, (iv) the execution and delivery of this Agreement and the consummation of the transactions herein contemplated by the Company does not conflict in any material respect with, or constitute a material default under, the organizational documents of the Company, and does not violate any contract, instrument, or other agreement, whether written or oral to which the Company is a party or by which the Company is bound, (v) this Agreement constitutes the legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms, and (vi) the Company has all licenses, permits, consents and approvals required to be obtained by it from any regulatory agency exercising its authority over the Company in order for it to lawfully conduct its business, to perform its obligations hereunder and to receive the rights and benefits available to it hereunder except to the extent the failure to have any of the foregoing could not, singly or in the aggregate, reasonably be expected to have a material adverse effect on the Company.

b.      the Creditor represents and warrants to the Company that (i) the Creditor is a Delaware limited liability company duly organized, validly existing, and in good standing under the laws of the state of Delaware, (ii) the Creditor has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (iii) the execution and delivery of this Agreement and the performance of the terms hereof by the Creditor have been duly authorized by all necessary action on the part of the Creditor, (iv) the execution and delivery of this Agreement and the consummation of the transactions herein contemplated by the Creditor does not conflict in any material respect with, or constitute a material default under, the organizational documents of the Creditor, and does not violate any contract, instrument, or other agreement, whether written or oral to which the Creditor is a party or by which the Creditor is bound, (v) this Agreement constitutes the legal, valid, and binding obligation of the Creditor, enforceable against the Company in accordance with its terms, and (vi) the Creditor has all licenses, permits, consents and approvals required to be obtained by it from any regulatory agency exercising its authority over the Creditor in order for it to lawfully conduct its business, to perform its obligations hereunder and to receive the rights

Exhibit 4
Page 58

and benefits available to it hereunder except to the extent the failure to have any of the foregoing could not, singly or in the aggregate, reasonably be expected to have a material adverse effect on the Creditor.

5.    Confidentiality. The Parties agree that any and all Confidential Information (as defined herein) shall be used solely for the purposes of the lawful performance of this Agreement and shall not be used or disclosed to any third party except as authorized herein or by the Parties in writing.

      a.    Definition. As used in this Agreement, "***Confidential Information***" shall include (i) all information regarding an existing or potential client of the Company, (ii) each Party's proprietary information, trade secrets or other business information that is either identified as or should otherwise be reasonably understood to be of a confidential nature, as may be disclosed to the other Party in connection with the performance of this Agreement, and (iii) this Agreement and the nature, terms and conditions of this Agreement.

      b.    Limited Use. Each Party agrees it shall not, without the prior written consent of the other Party or as permitted by the terms and conditions of this Agreement, do any of the following: (i) disclose any Confidential Information to any third party; (ii) permit any third-party access to such Confidential Information; or (iii) use Confidential Information for any purpose other than in connection with the performance of its obligations under this Agreement.

      c.    Exceptions. The confidentiality obligations imposed on the Parties by this section shall not apply to Confidential Information which, through no fault of a Party: (i) is required to be disclosed in order to comply with applicable laws and regulations, court orders or other process of law, (ii) is required to be made to any tax, banking or other regulatory authority, or legal or financial advisor of either Party, (iii) is made to such Party's current or prospective lenders or investors, (iv) was already known to that Party prior to disclosure of the same Confidential Information by the other Party or is independently discovered by the Party, or (v) subsequently becomes available to the public at large without a breach of this Agreement.

      d.    Return of Confidential Information. Upon termination of this Agreement, both Parties shall return the Confidential Information of the other Party to the Party to which the Confidential Information belongs.

      e.    Enforcement. In the event of any breach of the obligations under this section, the Parties acknowledge that the Party adversely affected by the breach would have no adequate remedy at law to protect its Confidential Information, since the harm caused by such a breach could not be easily measured and compensated for in damages, and that in addition to such remedies as may be available, a Party may obtain injunctive relief including, but not limited to, specific performance.

      f.    Confidentiality of Agreement. The Parties agree that this Agreement and its terms are strictly confidential and shall not be disclosed to any person, firm, corporation, or other entity, orally or in writing, except as may be necessary to comply with applicable laws and regulations, court orders or other process of law, confer with a financial advisor, tax preparer, or lawyer regarding the subject matter of this Agreement, or to enforce this Agreement.

      g.    Survival. The provisions of this section shall survive the expiration or any termination of this Agreement or any addendum hereto.

6.    Indemnification. The Parties agrees to be responsible for their own actions, and each Party agrees to indemnify, defend and hold harmless the other party and such other Party's directors, officers, employees and agents for, from and against all claims and losses of any type, including reasonable attorneys' fees, in connection with, in whole or in part: (a) any negligent act or omission by, or any willful misconduct on the

3

Exhibit 4
Page 59

part of, the indemnifying Party; (b) the indemnifying Party's failure to comply with any applicable federal, state, or local law; or (c) any breach of this Agreement by the indemnifying Party.

7.    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any reference to any federal, state, provincial, territorial, local, or foreign law shall be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. Any reference to any contract or agreement (including schedules, exhibits and other attachments thereto), including this Agreement, shall be deemed also to refer to such contract or agreement as amended, restated, or otherwise modified, unless the context requires otherwise. The words "include," "includes," and "including" shall be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context requires otherwise. The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Where this Agreement states that a Party "will" or "shall" perform in some manner or otherwise act or omit to act, it means that such Party is legally obligated to do so in accordance with this Agreement. The captions, titles, and headings included in this Agreement are for convenience only and do not affect this Agreement's construction or interpretation. Any reference to an Article, Section, or Schedule in this Agreement shall refer to an Article or Section of, or Schedule to, this Agreement, unless the context otherwise requires. This Agreement is for the sole benefit of the Parties and does not, and is not intended to, confer any rights or remedies in favor of any person (including any employee, director, shareholder or third party lender or service provider of a party) other than the Parties.

8.    No Assignment by the Company. Except as set forth herein, the Company shall not assign, transfer, or otherwise alienate any or all of its rights or interest under this Agreement without the express prior written consent of the Creditor, which consent may be granted or withheld in the Creditor's sole discretion.

9.    Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersede (a) all prior oral or written proposals or agreements, (b) all contemporaneous oral proposals or agreements, and (c) all previous negotiations and all other communications or understandings between the Parties, in each case with respect to the subject matter hereof.

10.    Notices. Any notice, instruction, direction or demand under the terms of this Agreement required to be in writing shall be duly given upon delivery, if delivered by hand, facsimile, email or other generally accepted means of electronic transmission, or mail (with postage prepaid), to the following addresses:

If to the Company, to:

The Litigation Practice Group PC
17542 E 17th Street
Suite 100
Tustin, CA 92780
Fax No.: 949-715-0648
Email: admin@LPGLaw.com
Attention: Daniel S. March

Exhibit 4
Page 60

    If to the Creditor, to:

        Oxford Knox, LLC
        c/o Rick R, Emmett
        300 S. Harbor Blvd., Suite 1000
        Anaheim, CA  92805
        Fax No.: (714) 563-1316
        Email: remmett@investlincadvisors.com
        Attention: Rick R. Emmett, Manager

or to such other addresses or telecopy numbers as may be specified by like notice to the other Party.

11.    Severability. If any term or other provision of this Agreement shall be determined by a court, governmental authority, or arbitrator to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not render the entire Agreement invalid. Rather, this Agreement shall be construed as if not containing the particular invalid, illegal, or unenforceable provision, and all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Party. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to give effect to the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent permitted under applicable law.

12.    Amendment. This Agreement may only be amended by a written agreement executed by both Parties.

13.    Binding Effect. This Agreement binds and benefits the Parties and their respective successors and permitted assigns. Other than those persons entitled to indemnity hereunder, there are no third-party beneficiaries having rights under or with respect to this Agreement.

14.    Waiver. A provision of this Agreement may be waived only by a writing signed by the Party intended to be bound by the waiver. A Party is not prevented from enforcing any right, remedy, or condition in the Party's favor because of any failure or delay in exercising any right or remedy or in requiring satisfaction of any condition, except to the extent that the Party specifically waives the same in writing. A written waiver given for one matter or occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver for any other matter or occasion. Any enumeration of a Party's rights and remedies in this Agreement is not intended to be exclusive, and a Party's rights and remedies are intended to be cumulative to the extent permitted by law and include any rights and remedies authorized in law or in equity.

15.    Disputes.

    a.    Dispute Resolution. Except with respect to a Party's request for equitable or provisional relief or to otherwise protect its Confidential Information provided under this Agreement, no civil action, proceeding as set forth below with respect to any dispute, controversy or claim arising out of, or relating to, or in connection with, this Agreement, or the breach, termination, or validity hereof, including the validity of this dispute resolution provision (each of which dispute, controversy, or claim will be termed a "***Dispute***") between the Parties may be commenced, nor may a Party terminate any portion of this Agreement for a material breach of a material warranty, representation, covenant or obligation of this Agreement, until the Parties have first attempted to resolve the Dispute amicably in good faith.

Exhibit 4
Page 61

b.     Arbitration of Disputes. If the Parties cannot resolve a Dispute pursuant to Section 15(a) above, any and all disputes under this Agreement shall be resolved by final and binding arbitration pursuant to JAMS Rules of Arbitration. Such arbitration shall be conducted pursuant to the JAMS Streamlined Arbitration Rules & Procedures then in effect. The decision by the arbitrator shall be final and binding, may be confirmed by a court of competent jurisdiction and judgment shall be entered thereon. The arbitration shall be conducted in Orange County, California. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration (e.g., to compel arbitration) or from seeking equitable or provisional relief from a court of competent jurisdiction.

c.     Confidentiality of Proceedings. The Parties agree that any arbitration proceedings hereunder will be treated as the Confidential Information of both Parties and that the existence of the proceeding and any element of it (including, but not limited to, any pleadings, briefs or other documents submitted or exchanged and any testimony or other oral submissions and awards) will not be disclosed beyond the arbitration panel, except as may lawfully be required in judicial proceedings relating to the arbitration. In addition, if a Party's Confidential Information is required to be disclosed pursuant to an arbitration proceeding or other judicial proceeding, the Receiving Party shall treat the Disclosing Party's Confidential Information pursuant to the terms of Section 5 (Confidentiality).

d.     Attorneys' Fees and Costs. The prevailing Party in any arbitration or other legal proceeding shall be entitled to recover its reasonable fees and costs (including attorneys' fees) associated with the dispute from the other Party. The arbitrator shall determine who is the prevailing Party and award reasonable attorney fees.

e.     Choice of Law. This arbitration provision (including the validity and applicability of the agreement to arbitrate, the conduct of any arbitration of a Dispute, the enforcement of any arbitral award made hereunder and any other questions of arbitration law or procedure arising hereunder) and its interpretation, any and all Disputes between the Parties arising out of or relating to this Agreement in any manner, shall be governed by and construed in accordance with the substantive internal laws of the State of California, excluding its conflicts of law rules.

16.     Relationship of Parties. This Agreement does not create a fiduciary relationship, partnership, joint venture, or relationship of trust or agency between the Parties. Each Party shall have the obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed under this Agreement and shall be liable for all acts or omissions of its employees and agents in performing their respective obligations hereunder. The Company understands and agrees that it has complete control over the operation and decision making of its business.

17.     Further Assurances. From time to time, each Party agrees to execute and deliver such additional documents and will provide such additional information and assistance as any Party may reasonably require to carry out the terms of this Agreement.

18.     Survival. The Parties agree that the provisions of this Agreement that by their terms or nature are intended to survive the termination of this Agreement shall survive such termination.

19.     No Publicity. Neither Party shall issue a press release announcing the Parties' business relationship, without the prior, written consent of the other Party as to the context and content of such materials or press release. Each Party shall have the right to terminate its consent at any time and for any reason by providing written notice to the other Party.

20.     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which, when taken together, shall be one and the same document.

6

Exhibit 4
Page 62

Each Party may rely upon a "pdf" counterpart of this Agreement signed by the other Party with the same effect as if such Party had received an original counterpart signed by such other Party.

[Signatures on the following page]

IN WITNESS WHEREOF, the Parties have executed this Debt Repayment Agreement to be effective as of the Effective Date.

**OXFORD KNOX, LLC**

By: _____

Name: <u>Rick R. Emmett</u>

Title: <u>Manager/Secretary</u>

**THE LITIGATION PRACTICE GROUP PC**

By: _____

Name: <u>DANIEL MARCH</u>

Title: <u>MANAGING SHAREHOLDER</u>

## SCHEDULE 1

## REPAYMENT SCHEDULE

Starting Balance:        $12,000,000.00
Annual Interest Rate:    10.0%
Repayment Period:        72 months
Start Date:              November 1, 2021

| Repayment Date | Repayment Installment | Remaining Balance |
| --- | --- | --- |
| November 2021 | $757,454.09 | $11,334,950.40 |
| December 2021 | $0 | $11,431,219.84 |
| January 2022 | $629,090.35 | $10,896,899.08 |
| February 2022 | $357,142.30 | $10,620,609.71 |
| March 2022 | $0 | $10,343,421.67 |
| April 2022 | $200,000.00 | $10,226,792.26 |
| May 2022 | $200,000.00 | $10,111,951.32 |
| June 2022 | $200,000.00 | $9,993,419.41 |
| July 2022 | $200,000.00 | $9,876,596.40 |
| August 2022 | $200,000.00 | $9,758,781.19 |
| September 2022 | $200,000.00 | $9,637,346.52 |
| October 2022 | $200,000.00 | $9,517,499.32 |
| November 2022 | $200,000.00 | $9,394,081.51 |
| December 2022 | $200,000.00 | $9,272,168.23 |
| January 2023 | $200,000.00 | $9,149,219.52 |
| February 2023 | $200,000.00 | $9,017,871.07 |
| March 2023 | $200,000.00 | $8,892,762.58 |
| April 2023 | $200,000.00 | $8,764,209.94 |
| May 2023 | $200,000.00 | $8,636,947.06 |
| June 2023 | $200,000.00 | $8,506,291.83 |
| July 2023 | $200,000.00 | $8,376,838.42 |
| August 2023 | $200,000.00 | $8,246,285.54 |
| September 2023 | $200,000.00 | $8,112,419.40 |
| October 2023 | $200,000.00 | $7,979,620.77 |
| November 2023 | $200,000.00 | $7,843,562.86 |
| December 2023 | $200,000.00 | $7,708,480.79 |
| January 2024 | $200,000.00 | $7,572,251.45 |
| February 2024 | $200,000.00 | $7,428,805.70 |
| March 2024 | $200,000.00 | $7,290,201.04 |
| April 2024 | $200,000.00 | $7,148,476.66 |
| May 2024 | $200,000.00 | $7,007,491.12 |
| June 2024 | $200,000.00 | $6,863,443.11 |
| July 2024 | $200,000.00 | $6,720,036.73 |
| August 2024 | $200,000.00 | $6,575,412.39 |
| September 2024 | $200,000.00 | $6,431,306.41 |
| October 2024 | $200,000.00 | $6,287,644.25 |
| November 2024 | $200,000.00 | $6,137,679.68 |
| December 2024 | $200,000.00 | $5,988,109.29 |
| January 2025 | $200,000.00 | $5,837,268.58 |
| February 2025 | $200,000.00 | $5,680,513.38 |
| March 2025 | $200,000.00 | $5,527,060.20 |
| April 2025 | $200,000.00 | $5,370,844.26 |
| May 2025 | $200,000.00 | $5,214,761.02 |
| June 2025 | $200,000.00 | $5,055,978.23 |
| July 2025 | $200,000.00 | $4,897,220.79 |

Exhibit 4
Page 65

| | | |
|---|---|---|
| August 2025 | $200,000.00 | $4,737,114.99 |
| September 2025 | $200,000.00 | $4,574,406.35 |
| October 2025 | $200,000.00 | $4,411,558.84 |
| November 2025 | $200,000.00 | $4,246,174.39 |
| December 2025 | $200,000.00 | $4,080,539.16 |
| January 2026 | $200,000.00 | $3,913,497.16 |
| February 2026 | $200,000.00 | $3,741,984.27 |
| March 2026 | $200,000.00 | $3,572,066.87 |
| April 2026 | $200,000.00 | $3,399,782.49 |
| May 2026 | $200,000.00 | $3,226,958.73 |
| June 2026 | $200,000.00 | $3,051,837.84 |
| July 2026 | $200,000.00 | $2,876,058.93 |
| August 2026 | $200,000.00 | $2,698,787.10 |
| September 2026 | $200,000.00 | $2,520,694.27 |
| October 2026 | $200,000.00 | $2,341,675.89 |
| November 2026 | $200,000.00 | $2,159,278.71 |
| December 2026 | $200,000.00 | $1,975,919.16 |
| January 2027 | $200,000.00 | $1,791,002.31 |
| February 2027 | $200,000.00 | $1,603,207.26 |
| March 2027 | $200,000.00 | $1,415,124.91 |
| April 2027 | $200,000.00 | $1,225,112.23 |
| May 2027 | $200,000.00 | $1,033,818.67 |
| June 2027 | $200,000.00 | $840,671.97 |
| July 2027 | $200,000.00 | $646,113.29 |
| August 2027 | $200,000.00 | $449,902.20 |
| September 2027 | $200,000.00 | $252,093.13 |
| October 2027 | $252,093.13 | $0.00 |

Exhibit 4
Page 66

**Oxford Knox LLC**
**LPG Loan Calculations per agreement dated April 15, 2022**

**November 1, 2021 - June 30, 2023**

| From Date | To Date | Days | Total Pd | Principal | Interest | Beg Bal | Int | Annual | Per Day | Interest Amt | Ending Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/01/21 | | | | | | $12,000,000.00 | | | | | $12,000,000.00 |
| (Per Schedule 1 of agreement dated 4/15/22) | | | | | | | | | | | |
| 11/01/21 | Payment | | $757,454.09 | $665,049.60 | $92,404.49 | | | | | | $11,334,950.40 |
| 01/01/22 | Payment | | $629,090.35 | $438,051.32 | $191,039.03 | | | | | | $10,896,899.08 |
| 02/01/22 | Payment | | $357,142.30 | $276,289.37 | $80,852.93 | | | | | | $10,620,609.71 |
| 03/01/22 | 03/11/23 | 375 | | | | | 10% | $1,062,060.97 | $2,909.76 | $1,091,158.53 | $11,711,768.24 |
| 03/11/23 | Notice of Default Balloon Payment | | | | | $10,000,000.00 | | | | | $21,711,768.24 |
| 03/11/23 | 06/30/23 | 111 | | | | | 10% | $2,171,176.82 | $5,948.43 | $660,275.69 | $22,372,043.93 |
| **Totals** | | | **$1,743,686.74** | **$1,379,390.29** | **$364,296.45** | **$22,000,000.00** | | | | **$1,751,434.22** | **$22,372,043.93** |

*7/20/2023  Updated/jaw*

Exhibit 4
Page 67

# EXHIBIT 5

Exhibit 5
Page 68

| Payee | Bank Name | Account Name | Account Number | Transaction Date | Payment | 90 Day Transfer |
|---|---|---|---|---|---|---|
| **LPG PC; Syed Gilani** | Chase | The Litigation Practice Group PC | X3158 | 2/11/2022 | $5,344.99 | N |
| **LPG PC; Syed Gilani** | Chase | The Litigation Practice Group PC | X3158 | 3/11/2022 | $190,271.26 | N |
| **LPG PC; Syed Gilani** | Chase | The Litigation Practice Group PC | X3158 | 4/19/2022 | $254,488.04 | N |
| **LPG PC; Syed Gilani** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 8/15/2022 | $2,638.06 | N |
| **LPG PC; Syed Gilani** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 9/2/2022 | $80,906.55 | N |
| **LPG PC; Syed Gilani** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 11/16/2022 | $84,078.06 | N |
| **LPG PC; Syed Gilani** | Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/13/2023 | $78,910.81 | Y |
| | | | | **Total** | **$696,637.77** | |

Exhibit 5
Page 69

### PROOF OF SERVICE

I am over the age of 18 and not a party to this case. My business address is **655 W. Broadway, Suite 800, San Diego, California 92101.**

True and correct copies of the **TRUSTEE'S SECOND AMENDED COMPLAINT** will be served in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>**August 13, 2025**</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Leslie A Cohen -** leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com; bryn@lesliecohenlaw.com
- **Yosina M Lissebeck -** yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com; ayrton.celentino@dinsmore.com
- **Richard A Marshack (TR) -** pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com
- **Tyler Powell -** tyler.powell@dinsmore.com, lydia.tharp@dinsmore.com; wendy.yones@dinsmore.com
- **United States Trustee (SA) -** ustpregion16.sa.ecf@usdoj.gov

2. <u>**SERVED BY UNITED STATES MAIL**</u>: On <u>**August 13, 2025**</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Scott C. Clarkson
United States Bankruptcy Court
Ronald Reagan Federal Building & Courthouse
411 West Fourth Street, Suite 5130/Room 5C
Santa Ana, CA 92701-4593

Bae Enterprises, Inc.
Attn: Cloud Peak Law LLC, Registered Agent
1095 Sugarview Drive, Suite 500
Sheridan, WY 82801

3. **BY ELECTRONIC MAIL:** On <u>**August 13, 2025**</u>, I caused such documents described herein to be sent to the person(s) at the e-mail addresses listed below. I did not receive within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

David M. Goodrich, Esq. - dgoodrich@go2.law
Jeffrey I. Golden, Esq. - jgolden@go2.law
Anerio Altman, Esq. - aaltman@go2.law

**4. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **_____**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 13, 2025 | Wendy A.Yones | /s/ Wendy A. Yones |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |